941 F.2d 1213
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff/Appellee,
v.
William D. NELSON, Jr., a/k/a Dollar Bill, William Daniel
Nelson, a/k/a Daniel Nelson, Diana G. Nelson,
Damon Joe Nelson, Dana Nelson, Burlon
Davis, James Moss, Harvey D. Curry,
 Nos. 90-3081, 90-3108, 90-3109, 90-3110, 90-3111, 90-3113,
90-3114 and 90-3119.
 United States Court of Appeals, Tenth Circuit.
 Aug. 23, 1991.
 
 Before JOHN P. MOORE and McWILLIAMS, Circuit Judges, and KANE, District Judge.*
 ORDER AND JUDGMENT**
 JOHN P. MOORE, Circuit Judge.
 
 
 1
 Eight codefendants appeal their convictions and sentencing on sixteen counts of illegal drug activity, including conspiracy to possess with intent to distribute crack cocaine, possession of crack cocaine with intent to distribute, and distribution of crack cocaine, all within one thousand feet of an elementary school. We consolidate the cases for the purpose of disposition and affirm on all grounds.
 
 I. Background
 
 2
 William Daniel Nelson (Daniel) and his wife Diana Nelson lived at 143 West Insley in Bonner Springs, Kansas. William D. Nelson, Jr., (Dollar Bill), Damon Joe Nelson, and Dana Nelson are children of Daniel from prior relationships. Dollar Bill, and at times Damon, Dana and others, lived at 223 North Neconi, located within a block of the Insley house. Burlon Davis, Harvey Curry, and James Moss are not related to the Nelsons but had close contact with them and occasionally lived at the Neconi house. Both houses are located within one thousand feet of an elementary school.
 
 
 3
 The evidence of defendants' illegal drug activities came from searches of the two houses, several controlled buys using government informants, testimony from former customers and uncharged coconspirators, and statements from some of the defendants themselves. The picture which emerges from all the evidence is that the defendants earned their living by selling crack for cash and merchandise. Daniel and Diana supervised the operation; they obtained the crack and kept most of it at the Insley house. The substance was usually cut into $30 "rocks" which Daniel and Diana sold from the Insley house and the other defendants sold from the Neconi house. The evidence also showed that several of the defendants frequently traveled to Coffeyville, Kansas, to sell crack.
 
 
 4
 Dollar Bill pled guilty to the count of conspiracy to possess crack with intent to distribute it between mid-1988 and August 1989, in violation of 21 U.S.C. §§ 841(a)(1) and 846. All the other defendants were found guilty by the jury on the conspiracy count. Several of the distribution counts charged in the indictment were eventually dismissed, but defendants were convicted of various other counts of distribution of crack and possession with intent to distribute within one thousand feet of an elementary school. 21 U.S.C. §§ 841(a)(1) and 860. Burlon Davis, Daniel, Diana, and were each convicted of two counts of distribution and one count of possession with intent to distribute. Harvey Curry was convicted of one count of distribution and two counts of possession with intent to distribute. James Moss and Dana were each convicted of one count of possession with intent to distribute. Daniel was sentenced to life imprisonment and Diana was sentenced to 360 months. Dana and Burlon Davis were each sentenced to 292 months. Dollar Bill and Damon were each sentenced to 262 months. James Moss and Harvey Curry were each sentenced to 235 months.
 
 
 5
 Defendants allege numerous errors in the conduct of the trial and sentencing. The government's presentation of its case both at trial and on appeal leaves much to be desired in detail and structure, but our own review of the record and examination of the relevant law convinces us that no reversible errors occurred at trial.
 
 II. Suppression Issues
 
 6
 A. February 7, 1989 Search of the Insley house
 
 
 7
 Daniel, Diana, and Damon Nelson appeal the district court's refusal to suppress evidence seized during a search of the Insley house on February 7, 1989. Citing Franks v. Delaware, 438 U.S. 154 (1978), they argue that certain remarks in the affidavit supporting the search warrant were deliberately or recklessly false, invalidating the search warrant. Whether an affidavit contains such false statements is a factual question subject to clearly erroneous review.[1] United States v. Sullivan, 919 F.2d 1403, 1423-24 (10th Cir.1990). We discern no error in the trial court's decision and affirm. See Sullivan, 919 F.2d at 1423-24; United States v. Corral-Corral, 899 F.2d 927, 933-34 (10th Cir.1990).
 
 
 8
 The disputed statements concern the reliability of the affiant's confidential informant. Sergeant Jim Dick stated in the affidavit: "I have used this confidential informant before. He has given the Edwardsville Police Department information for over five years, and all of the information has shown to be reliable." Defendants contend Sergeant Dick contradicted these assertions when he stated at the suppression hearing that he did not personally receive information from the informant for a period of five years or personally know how reliable the informant was. R. VII, 12, 16.[2] However, the affidavit only asserts that the police department has used the informant for over five years and found his information to be reliable.
 
 
 9
 The defendants also point out that the informant, Gary Smith, denied having ever worked as a confidential informant for Sergeant Dick during cross-examination by defense counsel. On redirect, Mr. Smith stated he did not know what a confidential informant was and couldn't remember whether he had ever given information about crimes to the police. R. XIII, 456-59. However, the record shows that Mr. Smith was confused about many things at trial. Furthermore, the chief of Edwardsville police testified that he had known Gary Smith since 1977, had received information from him before, and that none of it had ever been found false. R. XVI, 911.
 
 
 10
 B. February 7, 1989 Search of the Neconi house
 
 
 11
 Harvey Curry, Burlon Davis, Dana, Damon, Diana, and Daniel appeal the district court's decision not to suppress evidence seized during the search of the Neconi house.[3] These defendants make the same untenable claim discussed in section A about false statements in the affidavit. In addition, they argue the affidavit did not provide sufficient detail to establish probable cause. We conclude, under United States v. Leon, 468 U.S. 897 (1984), that the evidence is admissible even if the warrant is not supported by probable cause because the police acted in objective good faith. The applicability of Leon is a question of law which we review de novo. Corral-Corral, 899 F.2d at 929. The affidavit states:
 
 
 12
 On February 5, 1989, at approximately 11:00 a.m. and on February 6, 1989, at approximately 9:20 p.m. a confidential informant purchased quantities of cocaine at 223 North Neconi, Bonner Springs, Kansas.
 
 
 13
 223 North Neconi is a one-story, single family framed dwelling which has an enclosed front porch with a plastic outside covering. This is a concrete retaining wall half-way across the front of the house. The building is on the east side of Neconi, the second structure south of Insley.
 
 
 14
 I have used this confidential informant before. He has given the Edwardsville Police Department information for over five years, and all of the information has shown to be reliable.
 
 
 15
 The defendants argue this affidavit is " 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' " Leon, 468 U.S. at 923 (citation omitted). We disagree. Although the affiant could easily have described the drug purchases in more detail,[4] it does report buys at specific times at a specific address and vouches for the reliability of the informant. See United States v. Pettit, 903 F.2d 1336, 1340 (10th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 197 (1990); United States v. Bishop, 890 F.2d 212, 217 (10th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1164 (1990).
 
 
 16
 C. August 15, 1989 Search of the Neconi house
 
 
 17
 Daniel and Diana Nelson appeal the district court's decision to admit evidence from this search, arguing that the magistrate relied on stale evidence in issuing the search warrant. The government asserts Daniel and Diana have no standing because they did not live at the Neconi house. We need not resolve the standing issue because the defendants' argument fails on the merits. The record provides ample evidence that the warrant was not based on stale information.
 
 
 18
 III. Search of Burlon Davis Subsequent to Arrest
 
 
 19
 Burlon Davis argues that a notebook and two scraps of paper were seized illegally following his arrest on February 7, 1989. He first argues that the arrest was illegal, thus tainting the seizure of the papers, comparing his case to the facts in Ybarra v. Illinois, 444 U.S. 85, 93 (1979). A denial of a motion to suppress evidence will be upheld unless clearly erroneous. United States v. Lopez, 777 F.2d 543, 548 (10th Cir.1985).
 
 
 20
 This case is clearly distinguishable from Ybarra, where the defendant was present when the search was conducted, but the police had no reason to believe he was connected to the object of the search. Here, the district court found, based on evidence presented at the suppression hearing, that when the police officers entered the Neconi house on February 7, 1989, they encountered smoke from crack use and various items of drug paraphernalia in plain view throughout the house. R. Doc. 157, 5, Memorandum and Order of December 4, 1989. We have already held that the officers legally searched the Neconi house, and we have also noted that the officers knew about the controlled buys occurring at the house. The combination of the evidence of crimes being committed when they entered the Neconi house and the information they already possessed about the controlled buys was sufficient to support a finding of probable cause to arrest Mr. Davis. Therefore, his arrest was legal.
 
 
 21
 Next, Mr. Davis argues that the search of his person following the arrest was illegal both as a search incident to arrest and as an inventory search. He does not dispute the right of the officers to inventory his belongings, but argues that it was improper for them to have emptied the contents of his clothing, exposing the notebook and the scraps of paper. We need not decide whether this was a valid search incident to arrest because we conclude that the items were found during a valid inventory search. Although Mr. Davis argues that it was unnecessary for the officers to remove the scraps of paper from his jacket, this is exactly the function of an inventory search: to secure and record property of the person arrested, even if the police must catalog small items contained in a wallet. United States v. Matthews, 615 F.2d 1279, 1286 (10th Cir.1980). Here, there is no evidence that the police were engaged in an improper "rummaging" through Mr. Davis' items under Florida v. Wells, --- U.S. ----, 110 S.Ct. 1632, 1635 (1990), and therefore we find the district court did not clearly err in concluding the search of Mr. Davis following his arrest was proper.
 
 IV. Admission of Diana's Redacted Statement
 
 22
 Daniel claims that Diana's statement to Edwardsville police chief Dennis Robertson was improperly admitted under Bruton v. United States, 391 U.S. 123 (1968). He argues the district court should have either excluded this statement altogether or granted him a separate trial. Diana claims the court's redaction of her statement to Chief Robertson improperly denied her an opportunity to present her defense theory.
 
 
 23
 Chief Robertson testified at trial that Diana had contacted him after the search of the Insley house on February 7, 1989, and indicated her desire to speak with him. When Chief Robertson met Diana for the interview, he informed her that her statements could be used against her and proceeded with the questioning. Chief Robertson testified that Diana stated she had been involved in several sales of crack in the past; that Daniel had coerced her into selling crack, and that she was afraid of him and had contemplated divorcing him at one time. R. XVI, 913-17. Diana sought to introduce this entire conversation in support of her defense theory that she had been coerced by Daniel into participating in the distribution of crack. Daniel moved to exclude this evidence based on Bruton, arguing that it was a confession introduced to show his guilt which afforded him no opportunity to confront the author of the statement because Diana refused to take the stand. The trial judge weighed these concerns, along with the concern of judicial economy in holding a joint trial, and decided to allow Diana to introduce those portions of the statement to Chief Robertson that did not implicate Daniel in the crimes charged in the indictment.
 
 
 24
 In Bruton, the Supreme Court held that the Sixth Amendment Confrontation Clause rights of the defendant are violated if the government is allowed to introduce a codefendant's confession in order to implicate the defendant of the crimes charged and the codefendant does not testify. Id. at 136-37. However, the Supreme Court has subsequently refused to extend Bruton to cases where the defendant is not incriminated by name. Richardson v. Marsh, 481 U.S. 200, 211 (1987). In Richardson, the Court stated:
 
 
 25
 the [Bruton ] calculus changes when confessions that do not name the defendant are at issue.... We hold that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to not only eliminate the defendant's name, but any reference to his or her existence.
 
 
 26
 Id. The case in Richardson was remanded to determine whether the defendant was denied her Confrontation Clause rights. In United States v. Roberts, 583 F.2d 1173, 1176 (10th Cir.1978), cert. denied, 439 U.S. 1080 (1979), a pre-Richardson case, this court had occasion to consider the scope of a court's examination in determining whether a Bruton violation had taken place. In Roberts, we listed several factors, including whether limiting instructions were given and the effect of the admission of the codefendant's confession on the defendant's case. Id.
 
 
 27
 In the present case, the trial judge was well aware of the Bruton problem and took steps to balance Diana's right to present her defense theory with Daniel's Confrontation Clause rights. The judge decided that admission of a redacted statement with a limiting instruction was the best way to accommodate these potentially conflicting rights. We agree. Applying Roberts and Richardson, we believe Daniel's rights were not compromised because he was not directly implicated by Diana's statement. Incriminating references to Daniel by name were removed through the redaction. It is true that Diana's attorney was allowed to question Chief Robertson concerning whether Daniel was Diana's husband and whether she had stated that she had considered divorcing him. These statements, however, are not incriminating because they do not directly implicate Daniel in the crimes charged in the indictment. The trial judge did allow Chief Robertson to comment that Diana had stated "she didn't know whether he went and picked it [the crack] up or how it got there." R. XVI, 935. The reference here followed immediately after discussion of Diana's unhappiness with Daniel, and the jury could have connected Daniel to the reference to "him." Even if the jury drew such an inference, Diana's statement is far too equivocal to implicate Daniel in the crimes charged and trigger Bruton. We believe the trial judge did exactly what Richardson requires to protect the defendant's Confrontation Clause rights by admitting the redacted version of Diana's statement. The trial judge took the further precaution of issuing a limiting instruction.
 
 
 28
 Diana claims the trial judge denied her an opportunity to present her defense theory by redacting her statements to Chief Robertson. However, she fails to demonstrate prejudice because she is unable to articulate any relevant information that was excluded from the jury's consideration because of the introduction of the redacted version of the interview report. During oral argument, Diana's counsel stressed the impact of the jury hearing the full statement instead of a summary of its contents from Chief Robertson, but was unable to point to any information that was not made available to the jury in one form or another. The redaction allowed admission of evidence that Diana participated in the scheme under duress. In addition, the trial judge gave a duress instruction over the government's objection. The trial judge took every step possible to allow Diana to present her defense while protecting Daniel's Bruton rights. Therefore, we hold the trial judge did not violate either Daniel's Bruton rights or Diana's right to present her theory of defense.
 
 V. Burlon Davis' Severance Motion
 
 29
 Mr. Davis argues that his trial should have been severed from Daniel's and Diana's because of irreconcilable defenses. United States v. Peveto, 881 F.2d 844, 857 (10th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 348 (1989). He argues his admission that he owned the briefcase containing 62 grams of crack found at the Insley house, elicited upon cross-examination by the attorneys for Daniel and Diana, illustrates the irreconcilable defense problem.
 
 
 30
 While Peveto and the cases cited therein require severance in cases of irreconcilable defenses offered by codefendants, this is not such a case. Here, Mr. Davis' statement is not illustrative of an irreconcilable defense; it is merely an admission of his ownership of the briefcase. In fact, it stretches credulity to argue that this statement was a part of his defense strategy. The district court did not err in denying Mr. Davis' motion for severance.
 
 VI. Mistrial Motions
 
 31
 The decision to grant a motion for mistrial is within the discretion of the trial judge because he is best situated to evaluate the effect of improper testimony on the jury. Peveto, 881 F.2d at 859; United States v. Laymon, 621 F.2d 1051, 1053 (10th Cir.1980). A mistrial is warranted when the improper testimony could have had an appreciable effect on the verdict. United States v. Sands, 899 F.2d 912, 914 (10th Cir.1990); Maestas v. United States, 341 F.2d 493, 496 (10th Cir.1965) (mistrial warranted when improper testimony creates so strong an impression on the minds of the jurors that they are unable to disregard it even when instructed to do so).
 
 A. James Moss and Burlon Davis
 
 32
 These two defendants seek a mistrial because prosecution witness Harold Sutton revealed their involvement in a beating. The trial judge had prohibited mention of the incident because it was prejudicial and was not shown to be directly related to the drug conspiracy charge.
 
 
 33
 Despite being told not to mention the matter, Mr. Sutton referred to it twice, implicating each of the defendants once. During direct examination the prosecutor asked: "What have you seen [Mr. Moss] do that causes you to identify him as being a person involved in the sale or other distribution of crack?" Mr. Sutton responded: "Well, he was selling it and another thing is he, when--four or five months ago, he was involved in a beating with me." R. XVII, 1151. At the close of direct examination, Mr. Moss' counsel requested that Mr. Sutton be given another cautionary instruction but did not make a formal motion for mistrial.
 
 
 34
 During cross-examination, counsel for Burlon Davis questioned Mr. Sutton about when he had first met Mr. Davis. The following exchange then occurred:
 
 
 35
 Q: I take it that you were a heavy user of crack cocaine?
 
 
 36
 A: Yes.
 
 
 37
 Q: And I take it that this had some effect on your memory?
 
 
 38
 A: No.
 
 
 39
 Q: No effect whatsoever?
 
 
 40
 A: No. I remember that he was involved in trying to beat me and kidnap me and stole my car.
 
 
 41
 The trial judge immediately admonished the jury to disregard the statement. R. XVII, 1185-86. He denied the subsequent motion for mistrial made by Mr. Davis' counsel, finding that all the defense attorneys "tore into [Mr. Sutton], whether it be on that or something else, and I make a specific finding that there's no evidence that this witness purposely blurted this out." R. XVII, 1197.
 
 
 42
 Mr. Moss must show plain error to prevail because he seeks a mistrial for the first time on appeal.[5] United States v. Orr, 864 F.2d 1505, 1508 (10th Cir.1988). Although Mr. Sutton violated the trial court's order not to discuss the beating, we discern no plain error requiring a mistrial. The reference to Mr. Moss' involvement in "a beating" was fleeting and vague, and the prosecutor immediately steered the witness back to discussing cocaine sales. Neither the prosecutor nor the witness mentioned Mr. Moss' involvement again. The later reference to Mr. Davis' involvement in a beating did not implicate Mr. Moss, nor was it obvious that Mr. Sutton was even talking about the same incident. The trial court acted within its discretion in concluding that the lone improper remark about Mr. Moss did not make a strong enough impression on the jury to appreciably affect the verdict against him. See United States v. Nunez, 668 F.2d 1116, 1124 (10th Cir.1981) (no mistrial when witness revealed he was in protective custody in part because prosecution made no further use of the comment).
 
 
 43
 Mr. Davis properly preserved the mistrial issue for consideration on appeal, but we conclude the trial court also acted within its discretion in denying his motion for mistrial. The prosecution did not elicit the improper testimony; it occurred during cross-examination by defense counsel which the trial court found had taxed the witness. The trial court immediately cautioned the jury not to consider the information. The evidence supporting Mr. Davis' conviction was ample, including tape recordings of his involvement in controlled buys. Compare Sands, 899 F.2d at 915 (mistrial granted when prosecution acted negligently and evidence of guilt was not overwhelming).
 
 B. Dana Nelson
 
 44
 Dana's motion for mistrial is based on the prosecutor's introduction of a letter written by Dana to a witness which allegedly sought to coerce false testimony. During cross-examination of Dana, the prosecutor questioned Dana about witness Melissa Bolton's failure to identify him at trial as a person who sold crack although she had previously done so to an agent. Dana admitted writing a letter to Ms. Bolton, which the prosecution offered as an exhibit, but disputed the prosecutor's characterization of its contents as telling her not to testify about his involvement. Finally, Dana's counsel intervened, objecting on the grounds that he had never seen the letter before. R. XVIII, 1590-93.
 
 
 45
 After a conference, the court sustained defendant's objection, ruling that the prosecution could not introduce the letter because it was not previously provided to defense counsel. Under Fed.R.Crim.P. 16(a)(1)(A), the prosecution must permit the defendant, upon request, to inspect any statements of the defendant which it knows about. However, the court denied Dana's motion for mistrial, instead instructing the jury to disregard any testimony about the letter.
 
 
 46
 We are troubled by what appears to be at best an exceedingly careless action by the prosecutor in introducing a letter which he had not provided to defense counsel, and by the length and detail of the discussion about Ms. Bolton which lasted about two transcript pages. However, after searching the record, we conclude the matter does not warrant a mistrial. The court did strike the testimony and instruct the jury to disregard it, in contrast to United States v. Scafe, 822 F.2d 928, 934-36 (10th Cir.1987), in which the court erroneously admitted government exhibits in violation of Fed.R.Crim.P. 16(a)(1)(A). Nevertheless, in Scafe, we held the error harmless because other evidence of the defendant's guilt was overwhelming. Here, three witnesses testified about Dana's involvement in controlling customer traffic, at least five testified about him selling crack or handling the money from the sales, and he was arrested during the February 7, 1989 search of the Neconi house, which yielded a bank bag of ten individual baggies of crack. We disagree with defendant's contention that testimony about the letter to Ms. Bolton affected his attempt to show he was not the "enforcer" of the conspiracy. The testimony which the jury heard and was told to disregard did not include any reference to violent threats being made in the letter.
 
 VII. Admission of Evidence of Other Crimes
 
 47
 Diana, Damon, Dana, Mr. Davis, and Mr. Curry argue that the district court improperly admitted evidence of many other uncharged sales of crack. We disagree for two reasons. First, this evidence was admissible without regard to Rule 404(b) because it appears from our review of the record that the sales and other acts called into question by the defendants were within the scope and in furtherance of the conspiracy, and therefore constituted direct evidence of the crimes for which the defendants were being tried. Orr, 864 F.2d at 1510.
 
 
 48
 Second, even if we were to analyze this evidence under Fed.R.Evid. 404(b), we would find that it was properly admitted. The Supreme Court in Huddleston v. United States, 485 U.S. 681, 689-91 (1988), held that the trial court need not make a finding that the government has proved the prior act by a preponderance of the evidence in order to admit Rule 404(b) evidence, but only that the jury could reasonably conclude that the act occurred and that the defendant was the actor. In addition, the Huddleston court found that protection against unduly prejudicial or unsubstantiated accusations
 
 
 49
 emanates not from a requirement of a preliminary finding by the trial court, but rather from four other sources: first, from the requirement of Rule 404(b) that the evidence be offered for a proper purpose; second, from the relevancy requirement of Rule 402--as enforced through Rule 104(b); third, from the assessment the trial court must make under Rule 403 to determine whether the probative value of similar acts evidence is substantially outweighed by its potential for unfair prejudice ...; and fourth, from Federal Rule of Evidence 105, which provides that the trial court shall, upon request, instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted.
 
 
 50
 Id. at 691-92. See also United States v. Record, 873 F.2d 1363, 1374-76 (10th Cir.1989) (applying the Huddleston four-part analysis).
 
 
 51
 We believe the evidence contested by the defendants in this case is admissible under the Huddleston criteria. First, although the defendants argue this evidence was introduced by the government for the improper purpose of showing a propensity to commit crimes, they point to nothing in the record to support this charge. Our review convinces us that the district court did not abuse its discretion in finding this evidence was introduced for a proper purpose, such as showing motive, intent, or knowledge. Second, this evidence is highly relevant because it demonstrates awareness of the conspiracy, motive, intent, or knowledge. Third, while this evidence is certainly damaging to the defendants' case, it is also highly probative, and therefore survives a Rule 403 analysis. Fourth, the district court issued several limiting instructions cautioning the jury against using this evidence for any purpose other than those enumerated in Rule 404(b). Therefore, we believe the district court did not abuse its discretion in admitting this evidence of other uncharged sales and associated acts because it was direct evidence of the conspiracy charged as well as admissible under Rule 404(b).
 
 VIII. Sufficiency of the Evidence
 
 52
 When reviewing the sufficiency of the evidence to support a jury verdict in a criminal case, we consider all the evidence in the light most favorable to the government. The evidence is sufficient if a reasonable jury could find the defendants guilty beyond a reasonable doubt. In making our determination, we refrain from second-guessing the jury's assessment of witness credibility. United States v. Levario, 877 F.2d 1483, 1485 (10th Cir.1989).
 
 
 53
 Harvey Curry and Diana Nelson complain the evidence was insufficient to support their convictions for conspiracy to possess with intent to distribute crack. They contend that proof of the key element of a conspiracy, agreement, is absent. Agreement need not be express and can be rationally inferred from frequent contacts and joint actions among defendants. United States v. Esparsen, 930 F.2d 1461, 1472 (10th Cir.1991). A number of witnesses testified they had either bought crack from Mr. Curry or Diana, or had seen them sell it to others, from either the Insley or Neconi house. Mr. Curry argues incorrectly that because these were uncharged sales, they cannot be considered by the jury. See section VII. Both Diana and Mr. Curry were also implicated along with some of the codefendants in controlled buys. Mr. Curry was present during three house searches, and Diana during at least one, which yielded evidence of crack use and sales.
 
 
 54
 Diana further argues that her convictions on two counts of distribution and one count of possession with intent to distribute were not supported by sufficient evidence. The record shows the two distribution counts rested on controlled buys. The possession with intent to distribute count was based on evidence seized and Diana's arrest at the Insley house during the February 7, 1989 search. Officers found drug paraphernalia and numerous packets of crack and cash, including marked bills which had been used in controlled buys, in plain view.
 
 
 55
 Damon also challenges his conviction for conspiracy to possess with intent to distribute crack. He correctly points out that the two counts alleging specific sales by him were both eventually dismissed. However, under United States v. Savaiano, 843 F.2d 1280, 1294 (10th Cir.1988), proof of overt acts is not required for drug conspiracies. We explained in Savaiano that direct or circumstantial evidence may be considered; that the defendant need not know all the details of the operation and may play only a minor role in the conspiracy; and that mere presence at the scene of the crime does not, by itself, prove involvement but is a material factor. During at least part of the conspiracy, Damon lived at the Neconi house. At least six witnesses testified they had seen Damon sell crack. Two officers also testified that Damon admitted during questioning on February 8, 1989, after being told of his rights, that he had sold crack from the Insley house. Together, this evidence was sufficient for the jury to conclude that Damon had a knowing role in the conspiracy.
 
 IX. Transcripts of Controlled Buys
 
 56
 Diana argues that the district court improperly allowed the jury to examine transcripts of the tape recordings of controlled buys made surreptitiously by government informants because these transcripts were never admitted into evidence. The transcripts identified the voices on the tapes.
 
 
 57
 The law is well settled in this circuit that it is not necessarily an abuse of discretion to allow transcripts to be used by a jury to clarify recorded conversations. United States v. Davis, 929 F.2d 554, 559 (10th Cir.1991). We held in United States v. Lucero, 601 F.2d 1147, 1149-50 (10th Cir.1979), that a jury may examine transcripts of tape recordings if the trial court instructs the jury that the tapes and not the transcripts are the evidence, and that the transcripts are provided only to assist their understanding of the tapes. Here, the district court gave several such instructions. An adequate foundation for their consideration was laid by the testifying government informants, and defense counsel had ample opportunity to cross-examine the informants to discredit the transcripts. We have consistently held that use of prepared transcripts lies within the discretion of the trial court, United States v. Devous, 764 F.2d 1349, 1354-55 (10th Cir.1985), and cases cited therein, and we find no abuse of discretion in allowing the jury to examine these transcripts even though they were not admitted into evidence.
 
 X. Instruction on The Elementary School
 
 58
 Daniel and Diana appeal their convictions of distributing crack within one thousand feet of an elementary school. 21 U.S.C. § 860. They argue that the district court erred in adopting a jury instruction, submitted by the prosecution, which stated "as a matter of law, Northwest Elementary School ... is a public elementary school within the meaning of Title 21, United States Code, Section ." Because defendants did not object to the instruction at trial, they must show plain error which " 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " United States v. Simmonds, 931 F.2d 685, 687 (10th Cir.1991) (citations omitted).
 
 
 59
 The district court's reasons for giving this instruction are not clear from the record. However, the thrust of defendants' argument in their appellate briefs is that the district court usurped the jury's fact-finding function by declaring that Northwest School is an elementary school. That fact is one which the district court was entitled to take judicial notice of under Fed.R.Evid. 201(b), which permits notice of facts which are "not subject to reasonable dispute." The government called as a witness a land surveyor who testified that the school in question is a public elementary school. R. XVII, 1136.[6]
 
 
 60
 If the district court was taking judicial notice of a fact, its characterization of the matter as one of law is anomalous but not reversible plain error. If the district court was deciding, as the prosecutor suggested in oral argument, that Northwest's status as a kindergarten put it within the scope of the statute as a matter of law, we still find no grounds for reversal. Although Diana mentions a police officer's testimony that Northwest School is a kindergarten, R. XIV, 549, defendants did not put forward at trial, nor do they argue on appeal, the theory that a kindergarten is not as a matter of law an elementary school under § 860. Therefore, whether the district court made a proper legal ruling on that issue is not a question properly before us, nor can we discern any possibility that defendants were prejudiced by this instruction.
 
 XI. Sentencing Issues
 
 61
 A. Quantity of Crack Involved in the Offense
 
 
 62
 James Moss and Burlon Davis appeal the district court's calculation of the amount of crack distributed by the conspiracy for sentencing purposes. Mr. Davis argues that the district court's estimate violates the Confrontation Clause and is contrary to a preponderance of the reliable evidence used for sentencing. Specifically, he argues that the hearsay evidence was based on statements by drug users and thieves, and is therefore unreliable. Mr. Moss argues that he should not have been charged with the whole amount distributed by the conspiracy because he was in prison after February 7, 1989. Appellants argue that because only 67 grams of crack were seized in the final search of the two houses, this is the proper estimate of the crack distributed, and any amounts added by the district court were purely speculative and not shown by a preponderance of the evidence.
 
 
 63
 The district court based its calculation of quantity on several factors including the amount of crack seized during the searches, other evidence produced at trial, and hearsay statements of informants and customers interviewed by the police. A sentencing court may consider hearsay in calculating the amount of drugs distributed if it is relevant and comes from a reliable source. U.S.S.G. § 6A1.3. Here, the court made a specific finding that the hearsay evidence was sufficiently corroborated by the facts developed at trial to give them the sufficient indicia of reliability under the Guidelines. The court, citing U.S.S.G. § 1B1.3(1), held each defendant accountable for all acts committed by the conspiracy that were reasonably foreseeable. The sentencing court is not limited to considering the amount each defendant actually possessed. Following the commentary to § 1B1.3, the court considered amounts not included in the indictment because these drugs were distributed as part of the same scheme or plan as the counts in the indictment.
 
 
 64
 Applying these rules, the district court added to the 67 grams actually recovered its estimate of the total amount of crack sold from February 1989 through August 15, 1989.[7] U.S.S.G. § 2D1.4, application note 2 ("Where ... the amount seized does not reflect the scale of the offense, the sentencing judge shall approximate the quantity of the controlled substance"). Using information gathered from former customers and associates, the court determined that the Nelson operation sold at least 3 grams per day from at least February 1989 through August 15, 1989. The court explained that this was a conservative estimate because there was evidence that the conspiracy had been going on much longer than February to August; the court also adopted a relatively low estimate of the amount of crack sold per day. The court then sentenced each defendant based on its finding that the conspiracy had distributed 500 grams or more of crack.
 
 
 65
 First, in response to Mr. Moss' argument that he was in jail during a significant portion of the conspiracy, the record does not support this assertion. In fact, the government introduced evidence that Mr. Moss was released from jail soon after his arrest. However, even if we were to find that Mr. Moss was in jail during a portion of the conspiracy, this in and of itself is insufficient to constitute a withdrawal from the conspiracy. See Record, 873 F.2d at 1369-70.
 
 
 66
 Second, concerning Mr. Davis' arguments, use of hearsay evidence in sentencing that is sufficiently reliable does not violate the Confrontation Clause. United States v. Fortier, 911 F.2d 100, 103 (8th Cir.1990). Also, simply accusing the government informants of being drug users and thieves does not destroy the reliability of their statements when corroborated by the facts developed at trial and the testimony of the officers concerning the reliability of the informants. Finally, Mr. Davis presents no facts or arguments that show the district judge clearly erred in determining that a preponderance of the evidence demonstrated crack sales of at least 3 grams per day during the term of the conspiracy.
 
 B. Enhancement for Possession of a Firearm
 
 67
 Daniel argues the district court erred in enhancing his sentence for use of a firearm during the commission of a crime under U.S.S.G. § 2D1.1(b)(1) because one firearm was disabled and the others were not sufficiently connected with the drug trafficking. First, Daniel does not specifically dispute the fact that he gave a handgun to Michael Strathman, who was involved in selling crack with the Nelsons. However, he claims, and is supported by Strathman's testimony, that a firing pin in the gun did not work, rendering the pistol harmless.
 
 
 68
 While Daniel's assertions may very well be true, they are also inconsequential because the commentary to U.S.S.G. § 1B1.1(e) defines a firearm as, "any weapon which is designed to or may be readily converted to expel any projectile by the action of an explosive." The gun given to Strathman certainly satisfies the first description, and likely satisfies the second as well.
 
 
 69
 Second, the government need not prove that Daniel was actually carrying a firearm during the commission of drug trafficking crimes to make the adjustment proper. Section 2D1.1, note 3, states that the "adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." A number of firearms were discovered in the two houses, and Daniel presents no reason to believe that they weren't used in the drug trafficking. This court has frequently held that the presence of a firearm in an area where the defendant trafficks in drugs satisfies § 2D1.1(b)(1). See United States v. Goddard, 929 F.2d 546, 549-50 (10th Cir.1991) ("The Guidelines require only that a preponderance of the evidence support a finding that the circumstances surrounding the gun's presence do not make it 'clearly improbable' that the gun was connected to the offense.").
 
 
 70
 Mr. Davis argues that application of § 2D1.1 and the accompanying commentary improperly placed the burden of proof on him to prove that it was "clearly improbable" that the weapons were not used in the drug trafficking. He cites a split of authority among the circuits, with the Sixth and Ninth Circuits allowing this burden shift, and the Eighth stating that the government must bear the burden throughout the entire sentencing proceeding. Compare United States v. McGhee, 882 F.2d 1095, 1097 (6th Cir.1989) and United States v. Restrepo, 884 F.2d 1294, 1295-96 (9th Cir.1989) with United States v. Khang, 904 F.2d 1219, 1223-24 (8th Cir.1990). The logic of the Eighth Circuit approach is that sentencing is a continuation of the adversary proceeding, and the government must bear the burden of proof throughout. While this court has not addressed this precise issue, it has ruled in United States v. Kirk, 894 F.2d 1162, 1164 (10th Cir.1990), that the government bears the burden of proof for sentence increases, while the defendant bears the burden for decreases. The approach of the Sixth and Ninth Circuits tracks the clear language of § 2D1.1, note 3, that the adjustment be made "unless it is clearly improbable that the weapon was connected with the offense." As the Restrepo court noted, such a burden shift would not violate the Due Process Clause because defendants may be given certain burdens of proof to answer certain factual presumptions (e.g., the presence of a gun creates a presumption that it was used in drug trafficking). 884 F.2d at 1295-96. Yet, the shift does appear to run counter to traditional burdens at the sentencing phase as announced by this court. Kirk, 894 F.2d at 1164.
 
 
 71
 We need not decide whether a burden shift was proper in the present case, however, because in imposing the sentence the district court clearly did not shift the burden to Mr. Davis to prove that it was "clearly improbable" that he used the weapons in a drug transaction. In sentencing, the district court specifically addressed this point and made it clear that the enhancement was given based on a preponderance of the evidence and not upon any narrower standards contained in the Guidelines. R. XXII, 22, 31, and 40. In fact, the district court found that "there was probably more testimony as to this defendant [Mr. Davis] having possession of dangerous weapons than any other defendant in the whole case...." Id. at 40. Because the trial judge found the weapons enhancement proper by a preponderance of the evidence for the other defendants, the judge's comments concerning Mr. Davis make it clear that the court found his enhancement proper by a good deal more than a preponderance of the evidence.
 
 C. Obstruction of Justice
 
 72
 After considering other evidence adduced at trial and noting that the evidence should be evaluated in the light most favorable to the defendant, the district court found that Daniel lied repeatedly under oath and contacted witnesses and other interested parties to influence their statements, constituting obstruction of justice under the Guidelines. Accordingly, the court enhanced Daniel's sentence for obstruction under § 3C1.1. Daniel argues that the court found obstruction of justice solely because he denied guilt and exercised his constitutional right to refuse to testify.
 
 
 73
 This court should defer to the district court's factual findings in sentencing unless clearly erroneous. United States v. Williams, 897 F.2d 1034, 1040 (10th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2064 (1991). Here, the district court explicitly stated that this enhancement was not made because the defendant refused to admit guilt. Instead, it was based on the court's observation of Daniel's testimony, other evidence revealed at trial, and the presentence report. Daniel presents no evidence to rebut the court's finding.
 
 
 74
 Diana claims the district court's conclusion that she attempted to bribe or coerce witnesses to testify falsely "begs the question" of obstruction. The meaning of this argument is too obscure to fathom, and Diana fails to present any evidence to counter the district court's findings that she testified falsely and attempted to suborn the perjury of Robert Nelson and Melissa Bolton. The district court did not err in enhancing the sentences of Daniel and Diana for obstruction of justice. This conclusion also supports the district court's denial of Diana's request for a downward departure based on acceptance of responsibility.
 
 D. Enhancement for Role in the Offense
 
 75
 The district court found that Diana and Daniel were managers or supervisors of the crack ring. Diana and Daniel apparently argue that because other participants in the operation were also supervisors, the court is precluded from classifying them as supervisors as well. This court has held that anyone exercising any authority over another is subject to the supervisor enhancement, regardless of whether that defendant is the ultimate manager or boss. United States v. Backas, 901 F.2d 1528, 1530 (10th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 190 (1990). The evidence of Diana's and Daniel's supervision of the conspiracy produced at trial is more than sufficient to support this enhancement.
 
 E. The "Cocaine Base" Guideline
 
 76
 Harvey Curry and several other defendants who adopted his argument assert that because neither the Guidelines nor the United States Code define the term "cocaine base," § 2D1.1 of the Guidelines is void due to vagueness. We have recently rejected this very argument in United States v. Turner, 928 F.2d 956 (10th Cir.1991).
 
 F. Dollar Bill's Sentence
 
 77
 Dollar Bill argues that the district court erred in increasing his criminal history category for commission of a crime within two years of release from imprisonment and for failure to depart downward. Because Dollar Bill did not object to the enhancement at sentencing, we review for plain error only.
 
 
 78
 Dollar Bill was last released from juvenile detention on October 10, 1986. He was indicted in the present case for being a part of the conspiracy that began in "mid-1988." However, the first overt act listed in the indictment did not occur until February 1989. Section 4A1.1(e) calls for the imposition of an additional two points to the criminal history category if the defendant was released from imprisonment less than two years before commission of the instant offense. Therefore, in order for Dollar Bill to receive an enhancement for his criminal history category, the "commission of the instant offense" must have started no later than October 1988. He argues that there is no evidence that he joined the conspiracy prior to February 1989 regardless of when the conspiracy began. The presentence report found that his involvement in the conspiracy began less than two years after release from prison.
 
 
 79
 Because this is an enhancement of a sentence, the government has the burden of proof. Kirk, 894 F.2d at 1164. The government fails to point to any evidence in the record concerning when Dollar Bill joined the conspiracy. However, he pled guilty to count one of the indictment, which stated the conspiracy began in "mid-1988." Since a plea of guilty admits all elements of the charge contained in the indictment, McCarthy v. United States, 394 U.S. 459, 466 (1969), by pleading guilty Dollar Bill admitted involvement in the conspiracy beginning in mid-1988, which was less than two years after his release from his previous sentence.
 
 
 80
 Dollar Bill next argues that his sentence is disproportionate to the sentence imposed on his brother Damon, whom he characterizes as a similarly situated defendant. United States v. Sardin, 921 F.2d 1064, 1067 (10th Cir.1990). The district court based its departure in Damon's case on § 4A1.3, which allows downward departure if the court feels that the defendant's criminal history category "significantly over-represents the seriousness of a defendant's criminal history or the likelihood that the defendant will commit further crimes." After considering the testimony at trial and the presentence report, the district court simply found that Damon's history warranted this departure and Dollar Bill's did not. Section 4A1.3 is worded to allow the sentencing court discretion, and we find no abuse of that discretion in distinguishing Damon and Dollar Bill for sentencing purposes.
 
 
 81
 AFFIRMED.
 
 
 
 *
 The Honorable John L. Kane, Jr., United States District Judge for the District of Colorado, sitting by designation
 
 
 **
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3
 
 
 [1]
 Diana and Damon did not, according to the record on appeal, file their own motions to suppress. However, the trial judge brought them under the same umbrella as the other defendants by stating he would consider an objection by one defendant to be an objection by all defendants, and by accepting one defense counsel's renewal of the motion to suppress for "all" defendants when the Franks problem arose during the trial. R. XI, 9
 
 
 [2]
 All record references are to volumes as numbered in the record on appeal submitted by Daniel Nelson
 
 
 [3]
 The government asserts Diana and Daniel did not live at the Neconi house and therefore do not have standing to challenge the search. We need not resolve that matter because other defendants properly challenge the search, and we rule against them on the merits
 
 
 [4]
 These were controlled buys in which the informant was under surveillance during the purchases
 
 
 [5]
 Mr. Moss cites the motion for mistrial made by Mr. Davis, apparently relying on the trial court's statement that it would consider an objection by one defendant to be an objection by all defendants. However, Mr. Davis made his motion for mistrial on behalf of his client based specifically on Mr. Sutton's statement about Mr. Davis' involvement in a beating and theft. That motion cannot be presumed to cover Mr. Sutton's statement about Mr. Moss' involvement in a beating. Mr. Davis' motion could serve as an objection to the same statement on Mr. Moss' behalf, but Mr. Moss was not prejudiced by this reference to Mr. Davis' actions
 
 
 [6]
 Because this is a criminal case, the court, if it was taking notice of a fact, should also have instructed the jury that "it may, but is not required to, accept as conclusive any fact judicially noticed," Fed.R.Evid. 201(g), but that error did not prejudice these defendants. The jury had ample basis for accepting the court's instruction. See United States v. Piggie, 622 F.2d 486, 488 (10th Cir.), cert. denied, 449 U.S. 863 (1980) (defendant not prejudiced by court's failure to instruct jury that it was not bound by judicially noticed fact that penitentiary in which defendant was charged with committing sodomy was within the territorial jurisdiction of the United States and within the district of Kansas)
 
 
 [7]
 The indictment alleged the conspiracy lasted from mid-1988 to August 1989. The district court adopted a more conservative estimate of the length of the conspiracy for the purposes of calculating the amount of crack distributed. R.Doc. 315, 11